Patrick Q. Hall, Ca. Bar No. 97019
Lauren M. Hofflin, Ca. Bar No. 310005
Law Offices of Patrick Q. Hall
501 W. Broadway, Suite 730
San Diego, California 92101
Telephone: (619) 268-4040
Fax: (619) 268-4041
pat@pqhlaw.com

Attorneys for Defendant
MICHAEL JAMES STEVENS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Gonzalo P. Curiel)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL JAMES STEVENS,<br><br>Defendant. | CASE NO. 21-CR-660-GPC-1<br><br>**DEFENDANT STEVENS' SENTENCING MEMORANDUM**<br><br>**DATE:** September 20, 2021<br>**TIME:** 8:30 a.m. |

# I.
# INTRODUCTION

Notwithstanding the severity of the crime he committed, for which he completely accepts responsibility, Michael STEVENS is being punished in a completely different way. Michael STEVENS suffers from severe second-degree burns over approximately 60% of his body, injuries sustained in a fire in 2016. As the attached letters detail, Mr. STEVENS continues to have open wounds on his legs, amputated fingers, and lingering pain from the injuries he sustained. Mr. STEVENS' immune system has been

compromised, which in turn puts him at an exceptionally high risk of complications or death from COVID-19.  Mr. STEVENS' medical treatment has been unusually complicated and quite frankly deficient, while he has bounced from one detention facility to the next awaiting sentencing in this case. Somewhere in this process, Mr. STEVENS started out with a completely different Federal Register Number, which was somehow lost in between transfers.   To complicate things further, prior to being transferred to CCA, Mr. STEVENS' federal register number was 96546-298.  However, when he was transferred to CCA he was issued a different federal register number of 24599-509.  See Exhibit E, p. 33-34.  In that mix-up, the records identifying the medications he should be prescribed were lost as well.  As a result, Michael STEVENS medical care, while in custody for this offense, has been sporadic at best and he has unnecessarily suffered from long term pain simply due to mix-ups at the detention facilities.

      Mr. STEVENS continues to have open wounds from his prior injuries.  Prior to incarceration, Mr. STEVENS would cover the wounds with gauze.  However, because gauze was considered a security threat at MCC, Mr. STEVENS was unable to cover the wounds when he was at MCC.  Moreover, prior to incarceration, Mr. STEVENS was required to utilize a special soap, to cleanse the wounds and for his multiple skin grafts.  MCC would consistently run out of this special soap, and as a result, Mr. STEVENS incurred numerous staph infections, requiring him to seek medical treatment on a daily basis.

      Once Mr. STEVENS was transferred to San Luis Regional Detention Center, he was provided somewhat better care; however, his burns were still not healing and he was prone to infections.  The medical records from San Luis Regional Detention center document several times that Mr. STEVENS needs "multiple plastic surgeries due to extensive and complex scaring; [he] needs physical therapy ASAP." See Medical Records p. 144, attached as Exhibit E.  In addition, San Luis Regional Detention Center noted that he is "unable to receive t[reatment] in this facility."  See Exhibit E, p. 149).

These notations in the medical records highlight that Mr. STEVENS cannot receive the necessary treatment from the detention facilities' medical departments—the detention facilities simply cannot adequately deal with his burn injuries. His health has deteriorated while incarcerated and his continued incarceration without treatment of the open wound on his leg subjects him to health and painful consequences simply not addressed by the sentencing guidelines.

Sadly, although struggling with substance abuse practically his entire life, it was the pain medications for his burn injuries that led him back into a struggle of using more potent painkilles. Mr. STEVENS' involvement with drugs led him into a downward spiral of horrible decisions, which has marked his life with numerous encounters with the criminal justice system. Further, his injuries made him unable to work and to support his family, and in turn he made a horrible decision. His continued psychological nose-dive led to the conduct underlying this offense, and it is further evidence of the fact that Mr. STEVENS is the quintessential candidate for the BOP's Residential Drug Abuse Program ("RDAP").

Mr. STEVENS respectfully submits that under the factors set forth in Title 18 U.S.C. §3553, a variance/departure from the guideline range sentence would fully serve the purposes of protecting the public, while at the same time adequately deterring him from ever doing something like this again. He is therefore requesting that the court depart/vary to impose a sentence of 41 months.

## II.
## THE PLEA AGREEMENT

On May 17, 2021, Mr. STEVENS entered a guilty plea to one count of importing a controlled substance into the United States in violation of Title 21 U.S.C. §§ 952 and 960. Based on the written plea agreement, the parties have agreed to the following advisory guideline calculations:

| | |
|---|---|
| Base Offense Level [§ 2D1.1] | 34* |
| Importation of Methamphetamine [§ 2D1.1(b)(5)] | +2 |

| | |
|---|---:|
| Safety Valve [§§ 2D1.1(b)(18) and 5C1.2] | N/A** |
| Acceptance of Responsibility [§ 3E1.1(a)] | -3 |
| Fast Track [§ 5K3.1] | -4*** |

There is no agreement as to the defendant's criminal history category. The defendant may seek additional departures or adjustments and the Government may oppose additional departures or adjustments.

Additionally, the plea agreement provides: "The Government agrees to recommend the greater of: within the advisory Guidelines range as calculated by the Government after incorporating a downward variance under 18 U.S.C. § 3553(a) that is the equivalent of two levels under the Sentencing Guidelines; the statutory mandatory minimum sentence or the time served in custody at the time of sentencing." (Plea Agreement, Page 10. Ln 18-23.)

### III.
### MR. STEVENS PLAYED A MINOR ROLE

The sentencing guidelines require a court to look at the totality of the circumstances to determine whether a defendant played a mitigating role in the offense. In when determining how many levels to reduce the sentence, the courts are required to consider "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others [which] is indicative of a role as minimal participant." U.S.S.G. § 3B1.2 cmt. n.4.

Under the totality of the circumstance, the court should grant a minor-role reduction in Mr. STEVENS' case. First, he had little understanding of the scope or structure of the criminal activity. Drug-trafficking is a large-scale criminal enterprise that, in this case, begins with a broad organization in Mexico and then works through a distribution network throughout the United States. Mr. STEVENS knew little about the scope or structure of the organization. His only involvement was with a low lever recruiter who provided him with the drugs and instructions about who to contact once the drugs were successfully crossed into the United States. The fact that person may have had a larger

role in the drug trafficking network does not mean that Mr. STEVENS was anything other than a courier.

Mr. STEVENS had no role in planning or organizing the criminal activity. He was simply following the instructions of another person about where he was to cross and what he was to do next. He did not choose the date of the offense or the locations for pickup or drop-off—rather he was induced to participate to earn money to help pay his rent.

Nor did Mr. STEVENS exercise any decision-making authority. He did not determine what kind of drugs he would carry or how much he would carry. He had no control over where the drugs would go once in the United States. He was merely tasked as a courier to transport the drugs from one side of the border to the other.

Lastly, Mr. STEVENS stood only to gain the low amount he was to be paid for his limited role. He had no vested interest in the drug organization, and did not stand to gain anything extra from the sales of the drugs he couriered. The drug trade is a multi-billion dollar business, and individual loads often are valued in the hundreds of thousands of dollars by the time they are distributed. The benefit to Mr. STEVENS for his limited role was tiny when compared against the revenue generated by the overall criminal activity.

Mr. STEVENS thus meets every factor laid out by the Sentencing Commission for determining whether someone qualifies for a mitigating role reduction. As such, Mr. STEVENS asks the Court to apply the two-level adjustment downward for minor role under section 3B1.2.

### IV.
### MR. STEVENS'S PERSONAL HISTORY AND CHARACTERISTICS

The concept of a downward departure under the sentencing guidelines is obsolete. *See United States v. Dale*, 498 F.3d 604, 611 n.6 (7th Cir. 2007). ("Although *United States v. Booker*, 543 U.S. 220 (2005), renders the concept of "departures" obsolete, we have held that, unless there is reason to believe that the use of the term "departures" made a substantive difference, there is no error when using the term. (citation omitted)"

Mr. STEVENS is a forty-year old United States citizen. His was born to the union

of Michael James Stevens and Sherry Jones Stevens in Grass Valley, California. Sadly, he did not have an ideal childhood. He was mainly raised by his mother, as his father was often in and out of prison due to being heavily involved with drugs and his "fetish with guns." His mother was a workaholic, and he would often be left home alone. Later in life, his mother remarried; however, his step-father was physically abusive and would often try to fight him. After his mother found out that the step-father was physically abusing him, she ended the relationship with his step-father.

At the age of 15, Mr. STEVENS began to use methamphetamine. When he turned 17, his use of methamphetamine became heavy and spiraled out of control. At one point Mr. STEVENS was able to remain sober for over seven years. During this time, he was a volunteer firefighter. The attached letters describe the type of person he was—helping others and a dedicated single father at time to his 12 years old son, Joe. However, after his accident in 2016, Mr. STEVENS turned to heroin and opiates for the pain. These drugs were cheaper for him to get in Mexico. From there, his addiction spiraled further out of control.

When he was only 17 years old, Mr. STEVENS was in a relationship with a woman and their relationship produced a son, Justice. Justice is currently 23 years old and resides in Oregon. After his relationship with Jericho ended, Mr. STEVENS entered into new a relationship with Candice Fricia, and together they had a son, Chris. Chris is currently 20 years old and resides in Grass Valley. Chris and Mr. STEVENS maintain a close relationship.

Later, Mr. STEVENS entered into a relationship with Valeria Slyvan, and their union produced a son, Joseph. Joseph is currently 12 years old, and prior to this offense was residing with Mr. STEVENS. Since Mr. STEVENS has been incarcerated, his girlfriend of eight years, Jennifer Mariani, has been taking care of Joseph. Mr. STEVENS has emphasized several times that he wants to get his life on the right track and become a positive role model for Joseph.

Mr. STEVENS received his bachelor's degree in social science at Sierra College.

Prior to his injuries that occurred in 2016, he was employed as a tree cutter for five years. Before that, he owned his own landscaping business. As the probation officer noted in the PSR, he has "established a strong employment foundation." (See PSR, para. 81).

The letters submitted for Mr. STEVENS show that he is the type of caring person who goes out of their way to help others. For example, Bianca Hennifer provides multiple examples of how Mr. STEVENS helped her and her family out, whether it was fixing their house, helping her husband find a job, or just being there emotionally. See Bianca Hennifer Letter, attached as Exhibit B. Jennifer Mariani's mother letter details Mr. STEVENS' involvement as a volunteer firefighter and discusses his willingness to help others. See Rose Mariani Letter, attached as Exhibit C. Further, Jenifer Mariani's letter shows how compassionate he can be. See Exhibit C.

Mr. STEVENS is extremely remorseful for his involvement in this offense as it hurts people just like him. To help Mr. STEVENS address his underlying drug problem, he respectfully requests that this Court recommend he be placed in RDAP and make this recommendation as part of the judgment in the case.

Mr. STEVENS deeply regrets his conduct and accepts responsibility. He is determined not to bother this or any other court with his presence ever again. He intends to use his imprisonment as an opportunity to steer his life towards a better and brighter future and to help put him on the right path.

## V.
## CONDITIONS OF INCARCERATION AND MR. STEVENS MEDICAL CONCERNS

In 2016, Mr. STEVENS suffered from an unfortunate accident in which he suffered from severe second-degree burns over approximately 60% of his body. He was hospitalized and began an extensive history of treatment, including multiple skin grafts, which had not been fully completed at the time of his arrest in this case. In light of the burns and the skin grafts, his immune system is quite compromised.

As the Court is well aware, the growing global pandemic of coronavirus has reached 213 countries, infected 223,426,353 and caused more than 4,609,427 deaths worldwide.[1] In California alone, there are over 4,463,803 people who have tested positive for COVID-19 and 66,934 have died from the virus.[2]

Prisons, jails, and detention centers have been the leading hot spots for infections. For example, as of September 10, 2021, there are **486 federal inmates** and **526 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **42,873** inmates and **7,353** staff have recovered. There have been **252** federal inmate deaths and **5** BOP staff member deaths attributed to COVID-19 disease.[3]

The correctional facilities have addressed the pandemic by "locking down" the inmates. As a result, Mr. STEVENS has been locked down 23 hours per day, with only one hour per day for exercise, showers, and phone calls. None of the substance abuse programs have been available to him. With limited access to communications, Mr. STEVENS has limited ability to talk to his family and attorney. Further, jails and prisons are often overcrowded and have inmates and staff consistently coming and going, which makes this environment ripe for the spread of infectious disease, especially from those who are asymptomatic.

In addition, Mr. STEVENS' medical treatment at all of the detention centers he has been to have been unusually complicated. To tend to his burns, he requires compression sleeves for both arms, compressions sleeves for both of his thighs, a special soap called Hibiclens that helps prevent the infections, and needs his dressings changed at least twice a day. In addition, he requires continuous physical therapy to maintain mobility of his limbs. Further, one of the skin grafts that was done behind his right knee did not take, leaving an open wound on his leg, which is severely prone to infection.

---

[1] https://coronavirus.jhu.edu/map.html

[2] https://www.worldometers.info/coronavirus/usa/california/

[3] https://www.bop.gov/coronavirus/

Unfortunately, the prisons are not adequately equipped to provide the necessary medical treatment and physical therapy that Mr. Mr. STEVENS desperately needs. For example, MCC advised that he could not use gauze, which apparently is prohibited at MCC due to security risks, and he frequently runs out of the special soap at MCC. As a result, Mr. STEVENS has sustained three staph infections over the past thirty days. See MCC Medical Record attached as Exhibit E, reflecting "heavy growth of staphylococcus aureus" behind his right leg. Further, Exhibit E reflects the history of Mr. STEVENS' medical visits at MCC, which reflects that he has been seeing the medical unit on a daily basis. Attached as Exhibit E, is a list of the medications prescribed at MCC, which includes the medications for his staph infections.

As a result, Mr. STEVENS encounters daily struggles due to his medical conditions, that most inmates typically do not face. With the COVID-19 pandemic, Mr. STEVENS is even more fearful of contracting the coronavirus. Consequently, Mr. STEVENS is more susceptible to infections and vulnerable to the coronavirus. This is an unusual circumstance which should be taken into consideration in determining the appropriate sentence to impose.

## V.
## CONCLUSION

Under all the factors set forth in Title 18 U.S.C. §3553, a sentence below the guidelines is merited as sufficient to deter Mr. STEVENS from ever committing another offense while adequately punishing him as an individual. Accordingly, he requests that the court consider a sentence of 41 months with a recommendation that he be placed in RDAP.

Respectfully submitted,

Dated: September 13, 2021

 s/Patrick Q. Hall
PATRICK Q. HALL
Attorney for Defendant
MICHAEL JAMES STEVENS